## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

-------------------------------------------------------------------

REDHAWK HOLDINGS CORP. and
BEECHWOOD PROPERTIES, LLC,
                    Plaintiffs,

     -vs-

DANIEL J. SCHREIBER and
SCHREIBER LIVING TRUST – DTD 2/08/95
                  Defendants.

Case No.: _____

Civil Action

Filed: _____

---

### COMPLAINT

1.    Plaintiffs RedHawk Holdings Corp. and Beechwood Properties, LLC respectfully file this Complaint and allege as follows:

### PARTIES

2.    Plaintiff RedHawk Holdings Corp. (the "**Company**") is a Nevada corporation whose principal place of business is Lafayette Parish, Louisiana.  The Company was formerly known as Independence Energy Corp., including while many of the events giving rise to this action took place.  The Company changed its name to RedHawk Holdings Corp. effective on or about October 12, 2015.

3.    Plaintiff Beechwood Properties, LLC ("**Beechwood**", collectively with the Company, "**Plaintiffs**") is a Louisiana limited liability company whose principal place of business is Lafayette Parish, Louisiana.

4.    Defendant Daniel J. Schreiber ("**Mr. Schreiber**") is an individual of the age of majority and, on information and belief, a resident of San Diego County, California.

5.    Defendant Schreiber Living Trust - DTD 2/08/95 (the "**Schreiber Trust**", collectively with Mr. Schreiber, "**Defendants**") is a California trust whose registered address is

2627697v1

in San Diego County, California.  On information and belief, and according to SEC Filings made by Mr. Schreiber on behalf of himself and the Schreiber Trust, Mr. Schreiber is the Trustee and a beneficial owner of securities owned by the Schreiber Trust.

## JURISDICTION AND VENUE

6.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, in that claims in this action arise under the Constitution, laws, or treaties of the United States, including the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and this Court has pendant jurisdiction, pursuant to 28 U.S.C. § 1367, over the other related state-law claims.  Jurisdiction in this Court is also proper pursuant to 28 U.S.C. § 1332, in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different States.

7.      Venue is proper in this Court pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, because an act or transaction constituting a violation of the act occurred in this judicial district.  Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims occurred in this district.

## ALLEGATIONS – DEFENDANTS' FRAUDULENT SCHEME

8.      Effective March 31, 2014,[1] American Medical Distributors, Inc. (**AMD**) entered into an Asset Purchase Agreement (the "**APA**") with the Company, then known as Independence Energy Corp.  A copy of the APA is attached as **Exhibit A**.  The APA memorialized what is here termed the "**AMD-RedHawk Transaction**".

9.      In the APA, the Company agreed to issue AMD or its designees 152,172,287

---

[1]      The APA gives the target Closing Date as March 21, 2014.  However, the transaction did not close until March 31, 2014, as indicated in the applicable SEC filings.

shares of stock in the Company. (Exhibit A, the APA, p. 3, ¶3(A)).  This would give AMD one share less than 50% of the outstanding shares, and ownership, in the Company.

10.    In exchange, AMD agreed to pay the Company $60,000 and to assign the Company all of AMD's assets and property (the "**Assets**"), including certain Assets explicitly identified in the APA.  The principle Asset assigned was AMD's rights in a "**Distribution Contract**" providing the exclusive right to distribute certain "**Device Technology**" in North, Central, and South America. (Exhibit A, the APA, p. 1).

11.    In the APA, Defendants made multiple representations concerning the Assets on behalf of "AMD and its Principals". (Exhibit A, the APA, p. 5, ¶6).  These representations included that:

- "D. <u>No Litigation</u>", that, "no action, suit, proceeding or investigation is pending against AMD or affecting the Assets, and AMD has not received written notice of any threatened action, suit, proceeding or investigation against AMD or the Assets."

- "J. <u>Title</u>", that "AMD has good and marketable title to, and directly owns the Assets and has the full right to sell, transfer and deliver the same to [the Company] at the closing free and clear of any … charge, claim, [or] encumbrance…"

- "K. <u>Ownership; Liens</u>", that "…AMD will transfer to [the Company] good and marketable title to all of the Assets", the Assets "are adequate and suitable for the conduct of the Business", and "[n]one of the Assets are owned by any party other than AMD."

- "L. <u>Liabilities</u>", that "AMD does not have any liabilities associated with the Assets or the Business, absolute, contingent or otherwise, direct or indirect, matured or unmatured, which are not reflected or disclosed" in the filings provided.

- "M. <u>No Unlisted Liabilities</u>", that "AMD does not have any liability or obligation (whether accrued, absolute, contingent or otherwise) which are not set forth in the Schedules to this Agreement."

- "O. <u>Distribution Agreements</u>", that the "Distribution Contract is in full force and effect" and "[t]here exists no actual or threatened termination … or limitation of … this Distribution Contract."

- "P. <u>Disclosure and Accuracy</u>", that "[t]his Agreement … disclose[s] all facts material to the

Page 3 of 31

Assets and the Business. Not statement contained herein … or other instrument furnished to [the Company] pursuant to the provisions hereof contains or will contain any untrue statement of any material fact or will omit to state a material fact necessary in order to make the statements contained herein or therein not misleading."

- Q. <u>No Material Change</u>", that "…there has been no material change in the business and assets of AMD and to the best knowledge of AMD management, AMD has not become subject to any law or regulation which materially and adversely affects, or in the future may adversely affect the business, operations, properties, assets, or condition of AMD."

12.     The AMD-RedHawk Transaction was executed as provided in the APA. Beechwood and Defendants provided AMD $60,000; Thereafter AMD paid $60,000 to the Company and assigned the Company all of its assets including the Distribution Contract. The Distribution Contract purportedly provided exclusive distribution rights for the Device Technology in North, Central, and South America.

13.     In exchange, the Company assigned the agreed-upon shares of stock to the four designees of AMD. Defendants acquired their shares by: (a) paying half of the $60,000, (b) agreeing to fund half of certain start-up cost for the Company, and (c) agreeing to transfer certain assets to the Company.

14.     At the time of the transaction AMD was a New York corporation owned and controlled by Paul A. Rachmuth ("**Mr. Rachmuth**") and Howard Taylor.

15.     Following the transaction, the following AMD designees received the following number of shares of stock in the Company:

| Designee | No. of Shares |
| --- | --- |
| Beechwood (Plaintiff) | 57,064,608 |
| Schreiber Trust (Defendant) | 57,064,608 |
| Howard Taylor | 19,021,535 |
| Mr. Rachmuth | 19,021,536 |

16.     Essentially, Beechwood and Defendants agreed to put up the money for the

Page **4** of **31**

2627697v1

transaction ($30,000 each), while Howard Taylor and Mr. Rachmuth agreed to earn their interests in AMD, and thus the Company, in exchange for providing "sweat equity" as officers of AMD and the Company.

17.    Mr. Rachmuth specifically agreed to serve as legal counsel for AMD and Beechwood in the AMD-RedHawk Transaction, and agreed to conduct the due diligence for AMD and Beechwood in the transaction. As detailed below, Mr. Rachmuth failed to do this, in conspiracy with Mr. Schreiber. As a result, he, with Mr. Schreiber, caused AMD and the Company to make fraudulent misrepresentations and omissions, including in SEC forms and other documents disclosed to the Company's investors and shareholders.

18.    Unbeknownst to Plaintiffs, the Device Technology, whose exclusive North American distribution AMD assigned to the Company, was alleged at the time to infringe a patent of Exergen Corp. in the United States. Exergen Corp. is known as an aggressive defender of its patent rights and in fact would file multiple suits for infringement of that patent by purveyors of similar technology.

19.    As a result, the Company was assigned a Distribution Contract and Device Technology whose value was significantly impaired. The Distribution Contract authorized the exclusive distribution of the Device Technology in North, Central, and South America. However, the Device Technology actually could not be distributed in North America without facing a patent infringement claim by Exergen. Such a claim would be ruinous for a small company like RedHawk, making it effectively impossible for the Company to use the Distribution Contract to distribute the Device Technology in North America, by far the largest and most profitable of the three markets covered by the Distribution Contract (North, Central, and South America).

Page **5** of **31**

2627697v1

20.    Likewise unbeknownst to Plaintiffs, Defendants (Mr. Schreiber, and through him the Schreiber Trust) knew of this claim of infringement at the time of the AMD-RedHawk Transaction, when the APA was executed.

21.    As described below, Mr. Schreiber became a director of the Company effective March 31, 2014, the effective date of the AMD-RedHawk Transaction. Accordingly, he was a director of the Company on April 2, 2014 when the Company filed the Form 8-K with the Securities and Exchange Commission (**SEC**) disclosing the terms of the AMD-RedHawk Transaction, including a full copy of the APA with all its representations and warranties.

22.    The Device Technology could not be distributed in the largest market covered by the Distribution Contract on account of the infringement claim of Exergen, so these filings were deceptive and misleading. Further, this deception was fraudulent—Mr. Schreiber, working in concert with AMD, had knowingly caused these forms to include statements which were deceptive and misleading, then failed to correct them when he became a director of the Company prior to the Company filing them with the SEC.

23.    In addition, the infringement claim was discoverable at the time of the APA. Exergen had already filed multiple lawsuits to defend its patent on the Device Technology, and a simple Google search about the Device Technology would have revealed them. A competent attorney conducting due diligence on the AMD-RedHawk Transaction would have discovered this claim of infringement. However, Mr. Rachmuth failed to discover it, because he conducted **no** due diligence on the transaction.

24.    Mr. Rachmuth failed to conduct any due diligence at the behest of, and in conspiracy with, Mr. Schreiber. Mr. Schreiber instructed Mr. Rachmuth not to do due diligence (and **not** to inform Beechwood he was not doing due diligence), because doing due diligence (or

informing Beechwood he was not doing due diligence) would have revealed the infringement claim and killed the deal. As described below, Mr. Schreiber and Mr. Rachmuth were willing to defraud the Company and Beechwood to push the deal through, because they each benefited personally from it, including through acquisition of the shares of stock in the Company they each were issued by the Company, wrongfully and under false pretenses.

25.    Defendants' (Mr. Schreiber's, and through him the Schreiber Trust's) prior knowledge of Exergen's patent and claim of infringement is attested to by Jason Roth ("**Mr. Roth**"), whose affidavit is attached as **Exhibit B**. As described therein, Mr. Roth currently is President of RedHawk Medical Products and Services, U.S., a subsidiary of the Company and one of its primary business units. Mr. Roth joined the Company long after the AMD-RedHawk Transaction and had no involvement with the Company at that time. (Exhibit B, ¶3).

26.    As further described in his affidavit, Mr. Roth previously worked as a Senior Vice President at American Scientific Resources, Inc. ("**American Scientific**"), after American Scientific acquired a company he owned. (Exhibit B, ¶4).

27.    While Mr. Roth worked at American Scientific, Mr. Schreiber, directly and through a closely-held LLC, Granite Financial Group, LLC, became a major investor in American Scientific and became involved with and knowledgeable about its business. This included becoming knowledgeable about American Scientific's non-contact thermometer business, including that of its subsidiary, Kidz-Med, Inc. (Exhibit B, ¶5). Kidz-Med, Inc. attempted to sell or distribute a non-contact thermometer based on technology substantially similar to the Device Technology. Exergen would claim this technology infringed its patent and file numerous lawsuits against American Scientific and its subsidiary to enforce its claim. These suits began while Mr. Schreiber was making his investments in American Scientific, and indeed

were a reason American Scientific was seeking investment capital from Mr. Schreiber; consequently, the infringement claims of Exergen as they related to the Device Technology were disclosed to Mr. Schreiber clearly and unequivocally at that time. (Exhibit B, ¶6).

28.     Based on this experience, Mr. Schreiber, and through him the Schreiber Trust, had actual knowledge of the infringement claims of Exergen against the Device Technology. However, Defendants did not disclose this knowledge to Plaintiffs.   Instead, they made, and caused AMD in the APA and the Company in SEC filings to make, misrepresentations and omissions inconsistent with this knowledge.  These misrepresentations and omissions were made to the Company's investors, including Beechwood, who purchased securities of the Company in reliance thereon.

29.     As noted above, as a result of Defendants' misrepresentations and omissions, the Company was assigned a Distribution Contract and Device Technology whose value was significantly impaired.   The Device Technology could not be distributed in North America without facing a ruinous patent infringement claim by Exergen.  Defendants' misrepresentations and omissions artificially inflated the value of the assets acquired by the Company and the value of the securities of the Company acquired by Beechwood in reliance on those misrepresentations and omissions, and otherwise artificially and inaccurately distorted the share price of the Company's stock.  Finally, Defendants' misrepresentations and omissions, and the continuing misrepresentations and omissions by Mr. Schreiber as an officer and director of the Company described below, caused the Company to pursue a business plan and strategy that, because of the infringement claim, was effectively hopeless.   This cost the Company valuable time, management attention, and money, in addition to the resources lost by not pursuing a more effective business plan and strategy in the meantime.

Page <strong>8</strong> of <strong>31</strong>

30.     Defendants (and Mr. Rachmuth) made these misrepresentation and omissions because they benefited from them.  Mr. Schreiber benefited personally and through the Schreiber Trust, which he controls and of whose securities he is a beneficial owner.  First, Defendants' misrepresentations and omissions were material to the decision of Beechwood to fund AMD with Defendants and, through it, acquire an interest in the Company.  They also were material to the decision of the Company to enter into the AMD-RedHawk Transaction.

31.     In that transaction, and as a result of the agreement Defendants made with Beechwood regarding the funding of AMD and the shares issued by the Company to the AMD designees, the Schreiber Trust was assigned, for Mr. Schreiber's benefit, 57,064,608 shares of stock in the Company (and Mr. Rachmuth 19,021,536 shares).   These shares were worth $142,662 at the time of the transaction and almost $2.4 million at the stock's 52-week high.

32.     In September 2016, Defendants began attempts to dispose of the stock as rapidly as possible, on information and belief, to convert it to less easily recoverable cash.  Defendants are constrained by the restrictions on how many shares of a Company a five percent (5%) owner of that Company may sell in any given period.  To date, as of Defendants' most recent SEC filing of 1/19/2017, Defendants had sold 2,895,000 shares of stock for $43,804, leaving Defendants with 53,944,608 shares of stock worth, based on the Friday, January 27, 2017 daily share price range, between $798,380 and $836,141.

33.     The shares of stock issued to Defendants and the proceeds from their sale are ill-gotten gains of Defendants' misrepresentations and omissions.  They also were the initial step in the fraudulent scheme perpetrated by Defendants against the Company and its investors, as described herein.

34.     Further, Mr. Schreiber, coincident with his acquisition of the ill-gotten 57,064,608

shares, was named to the Board of Directors of the Company (the "**Board**") on March 31, 2014. Then, as discussed below, due in part to the securities Defendants fraudulently acquired in the Company, and in part to agreements Defendants made (and breached) with Beechwood, less than a year later, on or about February 27, 2015, Mr. Schreiber was named Chief Executive Officer (**CEO**) of the Company.

35.     Mr. Schreiber would be paid $60,000 by the Company for serving in that role. Further, Mr. Schreiber agreed, represented and promised to fund half of the Company's expenses and to contribute certain assets to the Company, as described below. This agreement by Mr. Schreiber was essential to Defendants receiving the 57,064,508 shares in the Company. However, Mr. Schreiber failed or otherwise refused to fulfill his obligations to Beechwood, failed or refused to fund half of the Company's expenses, and failed or otherwise refused to contribute the assets promised to the Company and its investors.

36.     Mr. Schreiber became a Director of the Company the day the AMD-RedHawk Transaction closed, effective March 31, 2014, and CEO on or about February 27, 2015. When he assumed these positions as a director and an officer of the Company, he assumed, and henceforth would owe, fiduciary duties of care and loyalty to the Company. His non-disclosure of the infringement claim against the Device Technology did harm, and his continuing non-disclosure of that claim would do continuing harm, to the Company and its shareholders. However, Mr. Schreiber did not, and never would, disclose his knowledge, in violation of his duties to the Company and its shareholders, including Beechwood, who purchased securities of the Company throughout Mr. Schreiber's tenure in reliance on Mr. Schreiber's misrepresentations and omissions.

37.     Mr. Schreiber was named CEO of the Company shortly after the Company

relocated its corporate offices and principal place of business to Lafayette Parish, Louisiana. Unless otherwise stated herein (as when Mr. Schreiber traveled to Baton Rouge and New Orleans, as described below) Mr. Schreiber generally acted from San Diego County, California. However, the Company's headquarters was in Lafayette Parish, Louisiana for the duration of his tenure with it.

38.     In addition, Beechwood was located in Lafayette Parish, Louisiana.  For all the events described here, except where indicated (such as where Beechwood's representative traveled to Baton Rouge and New Orleans to meet with Mr. Schreiber, as described below), Beechwood always communicated and acted in and from, and communications and actions toward Beechwood were always directed to, Lafayette Parish, Louisiana.

39.     Beechwood agreed with Defendants to provide funds to AMD, and through it to acquire an interest in the Company, based in part on agreements Beechwood and Defendants made to grow the Company by mutually investing in it.

40.     First, Defendants agreed with Beechwood to split the cost of funding the Company's expenses on an equal, 50-50 basis.  The Company would require capital to operate and to make investments and acquisitions necessary to grow.

41.     This agreement was negotiated and entered into prior to the AMD-RedHawk Transaction over the phone with Beechwood in Louisiana and Defendants in California.  After the parties acquired their interests in the Company, Defendants failed to perform their obligations under the agreement. Beechwood's representative confronted Mr. Schreiber about this in person, when they were in Baton Rouge and then, as the failure to perform persisted, in New Orleans, Louisiana.  On each occasion, Defendants (Mr. Schreiber, and through him the Schreiber Trust) offered assurances to Beechwood, and confirmed or made new or additional agreements with

Page **11** of **31**

Beechwood, that they would fulfill this obligation to fund half of the Company's expenses.

42. Defendants never would pay any of the funds they owed and agreed to pay to fund the Company pursuant to this agreement. This forced Beechwood to pay 100% of those expenses itself, an injustice and injury to Beechwood. Defendants' failure also inhibited the Company's ability to operate or make investments, injuring both the Company and Beechwood, which invested in the Company's securities in reliance on Defendants' promises and representations, including those made by Defendants to Beechwood concerning this agreement.

43. Second, Defendants agreed with Beechwood that they each would contribute various assets to the Company. They agreed to do this in principle, and as to certain assets, from the beginning. Once they had acquired an ownership interest in the Company, they agreed specifically as to which assets each would contribute.

44. Beechwood agreed to contribute to the Company (i) its interest in certain real estate ventures, including a resort in Hawaii and certain commercial property in Louisiana, and (ii) its interest in certain business ventures. Defendants agreed to contribute to the Company (i) their interest in two real estate ventures, namely two resorts in Hawaii (one being the same resort in which Beechwood had invested and agreed to contribute to the Company), and (ii) its interest in a business venture, Equal Earth Corp., formerly known as Baylor Solar Energy, Inc.

45. Defendants negotiated and entered into this contribution agreement with Beechwood, and confirmed it by making representations to other parties about it, in Louisiana. As noted, the Company was headquartered in Louisiana. Consequently, the Company held a series of meetings between its central management, its business unit heads, and its current and prospective investors, in New Orleans, Louisiana. Mr. Schreiber was the Company's CEO and personally traveled to New Orleans for these meetings.

Page **12** of **31**

46.     In these meetings in New Orleans, Defendants (Mr. Schreiber, and through him the Schreiber Trust) finalized and entered into the contribution agreement with Beechwood, agreeing to contribute the above-referenced assets to the Company. Mr. Schreiber, as CEO and a director of the Company, announced this commitment to the Company's managers, business unit heads, and investors attending the meetings. He made representations about the contributions Defendants would make to the Company in part to induce the Company's investors to invest in the Company's securities. These investors included Beechwood, which purchased securities of the Company in reliance on these misrepresentations.

47.     Beechwood would fulfill its agreements and commitments. It made all of its promised contributions to the Company, collectively worth an estimated $2.39 million, and funded its share of the Company's expenses totaling several hundred thousand dollars.

48.     Defendants would never make any of their promised contributions to the Company, nor did they fund their share of the Company's expenses. This was a breach of their agreements with Beechwood.

49.     In addition, Defendants, after they failed to perform and were confronted about this failure by Beechwood, continued to make representations about their commitments and intent to fulfill them. These assurances induced Beechwood to continue to invest in the Company's securities, and to make the bulk of its contributions to the Company (despite Defendants not doing so simultaneously), completing the bulk of the contributions by the end of December 2015. In order to assure the investing public that Defendants' continued failure to perform would be rectified, Mr. Schreiber agreed, as CEO, to issue a press release of February 16, 2016 in which Mr. Schreiber described Defendants' plan to assign certain assets to the Company and the impact that plan would have on the Company's value. Beechwood reasonably

concluded that Mr. Schreiber would not make such representations publicly, if these representations were untrue, so Beechwood continued to invest in the Company, in reliance on Defendants' representations. Mr. Schreiber's representations, as time would prove, were in fact false.

50.     Defendants never fulfilled their obligations. Beechwood and the Company satisfied every condition or demand Defendants raised, and completed their agreed upon contributions to the Company. Nevertheless, Defendants failed to perform and never offered any explanation for their failures.   On information and belief, Defendants never offered any explanation because there was no reasonable or acceptable explanation; the reason Defendants failed to perform was simply that they never had any intention to do so.   Instead, Defendants knowingly made misrepresentations and omissions to further their fraudulent scheme against Beechwood and the Company, and to continue and conceal that scheme.

51.     Defendants' breaches and misrepresentations and omissions have damaged Beechwood and the Company.   Beechwood has been forced to fund the Company's expenses and investments alone.   This has been an injustice and detriment to Beechwood, and it has hampered the ability of both Beechwood and the Company to operate and grow as had been agreed to with, and represented by, Defendants.

52.     Further, Defendants' breaches and misrepresentations injured the Company and its shareholders, including Beechwood, which purchased securities of the Company in reliance on Defendants' misrepresentations and omissions. Defendants' misrepresentations distorted and artificially inflated the Company's share price.  The Company also pursued certain strategies and investments, and chose not to pursue other strategies and sources of funding, in reliance on Defendants' misrepresentations and omissions. These strategies and investments failed when,

2627697v1

and as a result of, Defendants promises failing to materialize. This damaged the Company's business, in addition to causing a waste and loss of the Company's time, management attention, and money.

53.     Defendants benefited from their breaches and misrepresentations and omissions. Defendants only obtained an interest in the Company because of its agreements with, and the misrepresentations and omissions they made to, Beechwood. Beechwood then fulfilled its part of the agreements to provide funding and make contributions to the Company, and Defendants did not. This made the Company, and thus Defendants' interest in it, more valuable, giving Defendants the benefit of the bargain without Defendants having performed their part of it.

54.     Defendants' breaches and misrepresentations and omissions were instrumental in allowing Mr. Schreiber to become, and then remain, CEO and a director of the Company. This position allowed Defendants to continue concealment of their fraudulent scheme against Plaintiffs, and enabled  Mr. Schreiber  to receive at least $60,000 in payments  from the Company.

55.     While the above-described events were occurring, the Company was applying to the Financial Industry Regulatory Authority (FINRA) for various changes to its public share listing,  including for normally routine matters such as a name change and voluntary symbol request to recognize the Company's name change from Independence Energy Corp. to RedHawk Holdings Corp. FINRA rejected the Company's applications.

56.     The Company investigated the reason for FINRA's rejection of its request for a routine name change and symbol change. Mr. Schreiber informed the Company that he had issues with FINRA in the past, but he represented that those issues were all resolved, and immaterial to the Company's current issues. The Company's securities counsel investigated Mr.

Page **15** of **31**

Schreiber's past issues and determined they were material and should have been disclosed by Mr. Schreiber. Mr. Schreiber refused and insisted his past issues were immaterial, and in any case had been resolved, so that his past could not be the cause of the Company's current issues with FINRA. In the meantime, the Company was incurring what would be over $50,000 in legal fees as a result of Mr. Schreiber's failures to disclose the truth about his past transgressions. The Company spent and lost approximately $20,000 for the initial, denied application to FINRA, and approximately $30,000 investigating and pursuing what the Company's issue with FINRA could be, if Mr. Schreiber was correct that FINRA's position could not be related to his own past issues.

57.    The Company learned that Mr. Schreiber was not correct, and that FINRA's problems with the Company were exactly and solely related to Mr. Schreiber's past conduct. The Company received a letter from FINRA's Vice President of Market Operations dated November 5, 2015. A copy of this letter is attached as **Exhibit C**. It describes Mr. Schreiber's alleged past conduct, according to FINRA, as offering and paying bribes as part of a bribery scheme to commit securities fraud. It states Mr. Schreiber's association with the Company is the reason FINRA refused to allow the Company to do anything involving a public securities exchange, meaning as long as Mr. Schreiber was associated with the Company, the Company effectively could not function as a publicly-listed company.

58.    The letter explains that FINRA was refusing the Company's (routine) requests for a name change and voluntary symbol because it "has actual knowledge" that a person associated with the Company is "the subject of a pending, adjudicated or settled regulatory action or investigation ... related to fraud or securities laws violations." (Exhibit C, FINRA Letter, p. 1). "Specifically", the letter continues, "FINRA has actual knowledge of a civil injunction" against

"Daniel Schreiber", the "CEO and Chairman of [RedHawk]", citing "Civil Action Number 09-CV-288 (PKC) in the United States District Court for the Southern District of New York." (*Id.*, p. 2).

59.    The FINRA letter then describes the bribery scheme alleged in the prior Complaint against Mr. Schreiber.  According to the FINRA Complaint, two securities brokers, including Mr. Schreiber, as well as the broker-dealer firm which Mr. Schreiber owned and controlled, Granite Financial Group, LLC ("**Granite**"), paid bribes to certain investment company employees "in exchange for directed trades" from the investment company, defrauding the company's clients. (Exhibit C, FINRA Letter, p. 2).  The bribes included "international air travel (including for family members), hotel arrangements, cost for building a special crate to transport [an employee's] Great Dane, fully-paid vacations, daily car service, computer equipment, and monthly rent payments for a personal residence.  [The bribed employees] received at least $312,000 in such personal benefits collectively." *Id.*  The letter continues that "…Schreiber and Granite profited handsomely from this scheme as well" and explains the acts they took to "conceal[] the bribery scheme." *Id.*

60.    The letter notes that this activity "resulted in a final SEC judgment, permanently enjoining Schreiber from future violations of [certain sections] of the Securities Act of 1933 and ordered Schreiber and [his brokerage firm] to pay civil penalties of $100,000 and $250,000 respectively". In addition, Granite, Schreiber's brokerage firm, was censured. And penalties were assessed against Granite.  The letter concludes that "[t]he recent federal court judgment against Schreiber and [his brokerage firm] has raised concerns for FINRA regarding the protection of investors and the transparency to the marketplace as it relates to the proposed corporate action requests.  As such, the Department has deemed [the Company's] corporation action submission

2627697v1

to be deficient…" *Id.*

61.     The Company confronted Mr. Schreiber about the letter.  Mr. Schreiber, despite assuming the roles of CEO and a director of a publicly-traded Company, had never disclosed this alleged past misconduct to the Company or its investors. In fact, when demanded by the Company to do so, Schreiber refused to disclose it to the Company's investors.  The letter demonstrated conclusively that his protestations about the issues were self-serving and false— they were material, and they were the cause of the Company's issue with FINRA.  When confronted with the letter, Mr. Schreiber continued to insist he would resolve the FINRA issue, as otherwise the Company's association with him would make the Company unable to conduct essentially any business on a public securities exchange.

62.     Mr. Schreiber was not able to resolve his issues with FINRA.  He also continued to refuse to make any disclosure about the issues, his alleged past misconduct, or its effect on the Company and the Company's investors.

63.     In April 2016, the Company's shareholders, led by Beechwood, removed Mr. Schreiber as a director effective April 20, 2016.  On July 5, 2016, once a suitable successor was located, Mr. Schreiber resigned his position as CEO of the Company.

64.     Mr. Schreiber's misrepresentations and omissions as to his FINRA issues related to his engagement in a bribery scheme in violation of securities laws, as well as his violation of his fiduciary duties in failing and then continuing not to disclose these issues, injured the Company and its shareholders. Beechwood purchased securities of the Company throughout Mr. Schreiber's tenure as a director and CEO of the Company in reliance on Mr. Schreiber's misrepresentations and omissions.  Indeed, had Beechwood or the Company known the truth about Mr. Schreiber's past misconduct from the beginning, Beechwood never would have agreed

to invest in the Company with him.

65.     Likewise, neither Plaintiff would have entered into the original transaction with Defendants, through which Defendants were issued their shares in the Company, and which put them in position to continue and conceal their fraudulent scheme . The Company shares, which Defendants acquired from the Company in the AMD-RedHawk Transaction , and the proceeds from the sales of some of the shares), as well as the amounts Mr. Schreiber was paid as CEO of the Company, constitute ill-gotten gains of Defendants' fraudulent scheme, and Mr. Schreiber's violations of his fiduciary duties to the Company.

**CLAIMS**

66.     As to each claim below, Plaintiffs restate the allegations above in their entirety, as if reprinted and copied therein *in extensio.*

**CLAIM 1**
**Securities Fraud under Sections 10B and 20 of the Exchange Act and SEC Rule 10b-5**

67.     Section 10(b) of the Securities Exchange Act of 1934 (the "*Exchange Act*") provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce …--
>
> (b) To use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance …

15 U.S.C. § 78j, "Manipulative and deceptive devices".

68.     Rule 10b-5 is the rule by which the SEC has implemented that statutory section; it provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce,…
>
> (a) To employ any device, scheme, or artifice to defraud,

Page **19** of **31**

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.

69.     As alleged above, Defendants made multiple misrepresentations and omissions in connection with the purchase or sale of securities.  Defendants knew these misrepresentations and omissions were false at the time they were made, and Defendants intended that they operate, and they did operate, as a fraudulent scheme to deceive the Company and its investors.  These misrepresentations or omissions include: (a) Defendants' nondisclosure, and continued nondisclosure, of the infringement claim against the Device Technology; (b) Defendants misrepresentation that they would fund a 50% share of the Company's expenses, including Defendants' continued confirmations and offers of assurance, when questioned and challenged, that they would fulfill this commitment; (c) Defendants misrepresentations that they would contribute certain assets to the Company, including Defendants' continued confirmations and offers of assurance, when questioned and challenged, that they would fulfill this commitment; and (d) Defendants' misrepresentations, omissions and concealments concerning Mr. Schreiber's FINRA issues surrounding his past misconduct in committing bribery and securities fraud.

70.     Defendants knew these misrepresentations and omissions were false and misleading at the time they were made.  Defendants made these misrepresentations and omissions with the intent to defraud and deceive, to induce the Company's investors to purchase securities of the Company, and to induce the Company to issue securities under these false

pretenses. The Company sold and issued such securities, in each instance, in reasonable reliance on Defendants' misrepresentations and omissions.   Collectively, Defendants' multiple and continuous misrepresentations, concealments and omissions constitute a single fraudulent scheme by which Defendants acquired a substantial interest in the Company. Defendants then used the substantial interest they fraudulently acquired to repeatedly and continually defraud, deceive, and mislead the Company and its investors, and to conceal their fraud, for Defendants' own benefit.

71.     These investors include Beechwood, which purchased millions of dollars of securities of the Company continually throughout the period of the events described above. Beechwood did this in reliance on Defendants' misrepresentations and omissions. The Company asserts this claim on behalf of all of its shareholders not named as Plaintiffs here.

72.     Section 20 of the Exchange Act provides for joint and several liability for juridical entities and people who control or abet violators of the Exchange act.   To the extent either Defendant did not commit any of the above-described violations directly and personally as to either Plaintiff, then it did so as an aider and abettor under Section 20.

73.     As alleged above, Plaintiffs suffered loss, injury, and damages as a result of Defendants' misrepresentations and omissions, which caused the share price of the Company to be inflated and the value of the Company's assets to be overstated.   The Company also pursued flawed business plans and funding strategies based on Defendants' misrepresentations and omissions, resulting in substantial waste of Company resources. The Company also wasted over $50,000 in legal fees as a result of Mr. Schreiber's misrepresentations, omissions and concealment of his FINRA issues related to his past involvement in bribery schemes and securities fraud.

74.    In addition, as alleged above, Defendants received substantial ill-gotten gains from their fraudulent scheme.  These ill-gotten gain include the 57,064,608 shares of stock in the Company, and proceeds from sales of some of these shares of stock, as well as the approximately $60,000 Mr. Schreiber was paid by the Company.

75.    Defendants are obliged to compensate Plaintiffs for the injury, loss, and damages resulting from Defendants' fraud, and to disgorge to Plaintiffs the ill-gotten gains of their fraudulent scheme, including all shares of stock, all proceeds from sales of all shares of stock, and all amounts Mr. Schreiber was paid by the Company, in addition to pre- and post-judgment interest and costs, expert witness fees and expenses, attorneys' fees and litigation expenses, and whatever other relief Plaintiffs may be entitled to in law or in equity.

**CLAIM 2**
**Securities Fraud under Sections 18 and 20 of the Exchange Act**

76.    Section 18 of the Exchange Act provides that:

> Any person who shall make or cause to be made any statement in any [SEC filing] … which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance.

15 U.S.C. § 78r, "Liability for Misleading Statements".

77.    Liability under Section 18 lies as to a wide range of perpetrators, including those who actually made the fraudulent statement, "control persons", and aiders and abettors.

78.    As stated in Claim 1 above, Defendants caused false and misleading misrepresentations and omissions to be made in the Company's SEC filings, including in the Form 8-K disclosing the AMD-RedHawk Transaction. Defendants' misrepresentations include

Page **22** of **31**

their false promise to fund and contribute assets to the Company. Defendants' omissions include concealment of Mr. Schreiber's FINRA issues related to his past perpetration of a bribery scheme and securities fraud.

79.     These misrepresentations and omissions were known by Defendants to be false and misleading when made.  Further, these misrepresentations and omissions were material, as investors in the Company purchased and sold securities in reliance on them.  These investors include Beechwood, which purchased securities of the Company continually throughout the period of the events described above in reliance on Defendants' misrepresentations and omissions, without knowledge of their falsity.   The Company asserts this claim on behalf of all of its shareholders not named as Plaintiffs here.

80.     Section 20 of the Exchange Act provides for joint and several liability for juridical entities and people who control or abet violators of the Exchange act.  To the extent either Defendant did not commit any of the above-described violations directly and personally as to either Plaintiff, then it did so as an aider and abettor under Section 20.

81.     As alleged above, Plaintiffs suffered loss, injury, and damages as a result of Defendants' misrepresentations and omissions, as they caused the share price of the Company to be inflated and the value of the Company's assets to be overstated.  These misrepresentations and omissions also caused the Company to pursue flawed business plans and funding strategies, resulting in substantial waste of Company resources. Plaintiffs spent and lost over $50,000 in legal fees as a result of Mr. Schreiber's misrepresentations, omissions and concealments concerning his FINRA issues related to his past perpetration of a bribery scheme and securities fraud.

82.     In addition, as alleged above, Defendants received substantial ill-gotten gains

Page **23** of **31**

from their fraudulent scheme. These ill-gotten gain include 57,064,608 shares of stock in the Company, proceeds from sales of some of these shares of stock, as well the approximately $60,000 Mr. Schreiber was paid by the Company.

83.     Defendants are obliged to compensate Plaintiffs for the injury, loss, and damages resulting from Defendants' fraud, and to disgorge to Plaintiffs the ill-gotten gains of their fraudulent scheme, including all shares of Company stock, all proceeds from all sales of shares of Company stock, all amounts Mr. Schreiber was paid by the Company, in addition to pre- and post-judgment interest and costs, expert witness fees and expenses, attorneys' fees and litigation expenses, and whatever other relief Plaintiffs may be entitled to in law or in equity.

### CLAIM 3
### Fraud under State law

84.     As alleged above, Defendants planned and executed a scheme to defraud Beechwood and the Company in violation of Louisiana Law.

85.     This scheme included multiple and continuous misrepresentations and omissions. Defendants knew these misrepresentations and omissions were false and misleading when made, and made them with the intent to deceive and induce Plaintiffs to act in reliance on them, which Plaintiffs reasonably did.

86.     As alleged above, Plaintiffs suffered loss, injury, and damages as a result of Defendants' misrepresentations and omissions, as they caused the share price of the Company to be inflated and the value of the Company's assets to be overstated. Defendants' misrepresentations and omissions also caused the Company to pursue flawed business plans and funding strategies, resulted in substantial waste of Company resources, including over $50,000 in legal fees the Company wasted as a result of Mr. Schreiber's misrepresentations and omissions

concerning his FINRA issues related to his past perpetration of a bribery scheme and securities fraud.

87.     In addition, as alleged above, Defendants received substantial ill-gotten gains from their fraudulent scheme.   These ill-gotten gain include 57,064,608 shares of Company stock, proceeds from all sales of shares of Company stock, as well the approximately $60,000 Mr. Schreiber was paid by the Company.

88.     Defendants are obliged to compensate Plaintiffs for the injury, loss, and damages resulting from Defendants' fraud, and to disgorge to Plaintiffs the ill-gotten gains of their fraudulent scheme, including all shares of Company stock, all proceeds from sales of shares of stock in the Company, and all amounts Mr. Schreiber was paid by the Company, in addition to pre- and post-judgment interest and costs, expert witness fees and expenses, attorneys' fees and litigation expenses, and whatever other relief Plaintiffs may be entitled to in law or in equity.

## CLAIM 4
### By Beechwood for Breach of Contract

89.     As alleged above, Defendants entered into agreements with Beechwood, which Beechwood has performed and Defendants have breached, causing damages to Plaintiffs.  These agreements include: (a) the agreement to fund 50% of the expenses of the Company; and (b) the agreement to make contributions of certain assets to the Company.

90.     In both instances, Beechwood performed, funding the Company's expenses and contributing the agreed-to assets to the Company.   In both instances, Defendants failed to perform and breached the agreements, failing to fund any of the Company's expenses or contribute any assets to the Company.

91.     Defendants were notified and questioned about these breaches on multiple

occasions.   In each instance, Defendants offered assurances they would cure and fulfill their obligations, or made new or additional agreements to do so.   Defendants never fulfilled any of their obligations under these agreements.

92.      These breaches by Defendants have injured Beechwood and the Company, and provided Defendants with ill-gotten gains, as alleged above.   Defendants are liable to Plaintiffs for the loss, injuries, and damages resulting from their breach, and obligated to disgorge to Plaintiffs their ill-gotten gains, including all shares of Company stock, all proceeds from sales of all shares of Company stock, and all amounts Mr. Schreiber was paid by the Company, in addition to pre- and post-judgment interest and costs, expert witness fees and expenses, attorneys' fees and litigation expenses, and whatever other relief Plaintiffs may be entitled to in law or in equity.

## CLAIM 5
### By Beechwood for Unjust Enrichment

93.      Claim 4 above for breach of contract alleges an enrichment of Defendants, an impoverishment of Beechwood, a connection between the two, and an absence of justification or cause for the impoverishment or enrichment.   Claims 4 also alleges the existence of agreements between Beechwood and Defendants which Defendants breached, which breach provides Beechwood a remedy at law.

94.      Alternatively, in the event that Claim 4, or any part thereof as to either Defendant, is found not to lie in breach of contract, then Beechwood asserts those same allegations (excepting the existence, enforceability, or validity of either or any agreement as a result of which Claim 4 is found not to lie as to that agreement for either Defendant) to plead a claim for unjust enrichment.

95.     Defendants were unjustly enriched by their conduct as described above, and Beechwood was impoverished by it.  Beechwood entered into its relationship with Defendants and took actions in furtherance of the relationship at considerable expense, ultimately benefitting Defendants, and there is a connection between Defendants' enrichment and Beechwood's impoverishment.  Finally, if a breach of contract claim does not lie, then Beechwood has no remedy at law for this unjust enrichment.

96.     The above applies to Defendants collectively and to each Defendant individually. Should a breach of contract claim not lie against either Defendant, then it is liable to Beechwood for unjust enrichment.

97.     Accordingly, pursuant to the above, should both or either Defendant be found not liable for breach of any contract or agreement under Claim 4, then Defendants, collectively and individually, to whatever extent they are not held liable in breach of contract, are liable to Beechwood in and for, and to disgorge, their unjust enrichment, at a minimum being their ill-gotten gains of shares of Company stock, all proceeds from any sales thereof, all amounts paid to Mr. Schreiber by the Company, as well as pre- and post-judgment interest and costs, expert witness fees and expenses, attorneys' fees and litigation expenses, and whatever other relief Plaintiffs may be entitled to in law or in equity.

## CLAIM 6
### By RedHawk for Mr. Schreiber's Breach of Fiduciary Duties

98.     From March 31, 2014, Mr. Schreiber was a director of the Company, and from February 27, 2015 he was its CEO.  As a director and officer of the Company, Mr. Schreiber owed fiduciary duties of loyalty and care to the Company and its shareholders.

99.     As alleged above, Mr. Schreiber violated and failed to fulfill these duties,

blatantly and continually. His violations include his non-disclosure and misrepresentations and omissions concerning: (a) the infringement claim against the Device Technology(b) Defendants' intent to contribute assets to the Company; and (c) Mr. Schreiber's FINRA issues related to his past perpetration of a bribery scheme constituting securities fraud.

100.    These violations began the day he assumed his role as an officer or director of the Company and continued each day thereafter, as he continued not to disclose the truth. Defendants committed these violations for their own benefit, despite the harm they caused the Company and its investors.

101.    In all, as alleged above, Mr. Schreiber, directly and through the Schreiber Trust, planned and executed a fraudulent scheme against the Company and its investors, including through his position as a director and CEO of the Company, in violation of his duties to the Company and its shareholders, for his own benefit, and harming the Company and its shareholders.

102.    As alleged above, these violations injured the Company and its shareholders and yielded ill-gotten gains for Mr. Schreiber. Had Mr. Schreiber disclosed the truth about the Device Technology and Distribution Contract, or his past misconduct and FINRA issues, the Company would have been spared substantial time, money, and management attention it wasted pursuing doomed business plans and funding strategies, as well as legal fees. Likewise, had Mr. Schreiber followed through on his representations to fund the Company's expenses and make certain contributions of assets to the Company, or had he simply been honest with the Company and its investors concerning his intentions not to do so, then the Company and its investors would have been spared substantial wasted resources and would have been able to pursue different funding and growth strategies based on the truth. Finally, Mr. Schreiber committed

these violations for his personal benefit, which benefit constitutes ill-gotten gains of his violations, as alleged above.

103.    Mr. Schreiber is liable to the Company for the injuries and damages caused by his breaches and violations of his fiduciary duties, including the over $50,000 in legal fees incurred by the Company as a result of his FINRA issues. Defendants are obligated to disgorge to the Company all ill-gotten gains, including the 57,064,608 shares of the Company he received (directly or indirectly through the Schreiber Trust), all proceeds from the sales of Company stock, as well as for pre- and post-judgment interest and costs, expert witness fees and expenses, attorneys' fees and litigation expenses, and whatever other relief to which Plaintiffs may be entitled, in law or in equity.

## PRAYER FOR RELIEF

104.    As alleged above, Plaintiffs suffered a variety of damages, including, without limitation, direct, out-of-pocket, indirect, consequential, operating losses, and "benefit of the bargain" damages.

105.    Plaintiffs are entitled to, and respectfully pray for, a judgment awarding them these and any other damages to which they have a legal right, including, at a minimum, all 57,064,608 shares of RedHawk Holdings Corp. owned or acquired, now or previously, directly or indirectly, by either Defendant, all proceeds from any sales of such shares Defendants no longer own, all amounts paid to Defendants by the Company, all other improper profits and ill-gotten gains procured by Defendants as a result of their fraudulent scheme, securities law violations, and breaches of their duties and obligations alleged above, in a final amount to be determined at trial.

106.    In addition, Plaintiffs are entitled to pre-and post-judgment interest, expert

2627697v1

witness fees and expenses, attorneys' fees and litigation expenses, and court costs.

107.    Plaintiffs also respectfully request whatever other relief to which they may be entitled, and for this Court to assess and apply against Defendants whatever other penalties, fees, and/or consequences may be warranted, in law, equity, contract or by operation of law, in this Court's sound discretion and judgment.

RESPECTFULLY SUBMITTED this 18th day of January 2017, by:

/s/ Samuel E. Masur
**Gordon, Arata, McCollam, Duplantis &**
**   Eagan, LLC**
Samuel E. Masur (La. Bar  #1221)
Paul B. Simon (La. Bar #33679)
400 E. Kaliste Saloom Rd., Suite 4200
Lafayette, LA 70508-8517
Email: smasur@gordonarata.com
Email: psimon@gordonarata.com
Tel:  (337) 237-0132
Fax:  (337) 237-3451

/s/ André F. Toce
**The Toce Firm, APLC**
André F. Toce (#16769)
969 Coolidge Boulevard
Lafayette, Louisiana 70503
Telephone:  (337) 233-6818
Facsimile:  (866) 306-9336
Email: andre@toce.com

*Attorneys for Plaintiffs Redhawk Holdings*
*Corp. and Beechwood Properties, LLC.*

**PLEASE ISSUE TWO (2) CERTIFIED COPIES OF THE CITATION**
**FOR LONG-ARM SERVICE ON DEFENDANTS BY COUNSEL FOR PLAINTIFFS**

*On individual Defendant DANIEL J. SCHREIBER with address at:*
**7135 OLIVETAS AVE.**
**La JOLLA, CA 92037**

*And on entity Defendant SCHREIBER LIVING TRUST – DTD 2/08/95 with address at:*
**4660 LA JOLLA VILLAGE DRIVE**
**SUITE 500**
**SAN DIEGO, CA 92122**
**(858) 509-8800**

2627697v1

**EXHIBITS**

A.   The APA – Asset Purchase Agreement of March 31, 2014 between AMD and RedHawk.

B.   Affidavit of Jason Roth.

C.   FINRA Letter of November 5, 2015.