UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**REDHAWK HOLDINGS CORP., ET AL.**              **CIVIL ACTION**

**VERSUS**                                      **NO. 17-819**

**DANIEL J. SCHREIBER, ET AL.**                 **SECTION: "B"(5)**

### ORDER & REASONS

Defendants Daniel J. Schreiber and Daniel J. Schreiber, Trustee of the Schreiber Living Trust—DTD 2/08/95 ("Schreiber") filed a motion to enforce settlement after plaintiff RedHawk Holdings Corp. allegedly failed to comply with its obligations under the settlement agreement. Rec. Doc. 151. This court previously granted the motion, Rec. Doc. 162, and plaintiffs appealed. Rec. Doc. 163. The Fifth Circuit vacated that order and remanded to this Court for further proceedings to reconsider Schreiber's motion after permitting RedHawk to file its requested sur-reply. *RedHawk Holdings Corp. v. Schreiber*, 836 F. App'x 232 (5th Cir. 2020); Rec. Doc. 203-1 at 9. RedHawk subsequently filed its sur-reply, Rec. Doc. 208, and Schreiber responded. Rec. Doc. 210. Accordingly, for the following reasons,

**IT IS ORDERED** that the motion to enforce settlement is **GRANTED**.

The facts of the underlying action have been well documented on the record. Plaintiffs RedHawk Holdings Corporation and

1

Beechwood Properties, LLC filed this lawsuit against Daniel J. Schreiber, the former CEO and director of RedHawk, for, amongst other claims, securities fraud. Rec. Docs. 1, 20. Schreiber filed counterclaims alleging an interference with his ability to transfer his shares of RedHawk stock. Rec. Doc. 49. The parties engaged in settlement discussions before the Magistrate Judge in January 2019. Rec. Docs. 147, 148. Shortly thereafter, the undersigned was notified in February 2019 that a settlement had been reached. Rec. Doc. 149. This court subsequently dismissed the action but retained jurisdiction to enforce the settlement upon a showing of good cause. Rec. Doc. 150.

Under the settlement agreement, Schreiber would transfer all of his RedHawk stock back to RedHawk. Rec. Doc. 151-2 at 2. In exchange, RedHawk agreed to pay $250,000 immediately upon signing the agreement and issue two non-interest-bearing promissory notes in the amount of $200,000 each to be paid on or before September 6, 2020 and September 5, 2021 respectively. *Id.* The agreement contained an acceleration clause for the two promissory notes that included several terms including (1) a thirty-day grace period following any RedHawk default, after which all payments would be immediately due and payable plus 18% interest and the greater of reasonable attorneys' fees or 10% of the amount due and (2) a provision that if RedHawk issued any shares of any series or class for cash while any amounts are due, 50% of the monetary proceeds

were to be paid to Schreiber to reduce the amount owed. *Id.* at 3-4.

A few months after confecting the settlement agreement, RedHawk issued on September 16, 2019 a SEC Form 8-8k and a press release providing that it "completed the sale of $500,000 in aggregate principal amount of new convertible notes," and issued a number of stock warrants that are exercisable in ten years for the purchase of an aggregate of 12.5 million shares of RedHawk common stock. Rec. Doc. 151-1 at 3.

The following day, Schreiber informed RedHawk that this action triggered the acceleration clause because it failed to pay Schreiber $250,000 from the proceeds of the sale and RedHawk was now in default. Rec. Doc. 151-1 at 3. RedHawk responded it was not in default because the transaction was for sale of convertible notes and not for the sale of stocks. *Id.* at 4.

In November 2019, Schreiber filed a motion to enforce settlement seeking the accelerated amounts of the notes for $400,000 plus 18% interest running from the date of the agreement, and attorney fees of either the actual sums expended in pursuing that payment or 10% of the amounts due, whichever is greater. RedHawk responded to the motion and this Court granted Schreiber leave to reply. Rec. Docs. 157, 161. RedHawk opposed the motion for leave and requested an opportunity to submit a sur-reply should

the Court grant it but leave to file a sur-reply was denied. *See* Rec. Doc. 159.

In March 2020, this Court granted Schreiber's motion to enforce the settlement agreement, Rec. Doc. 162, and awarded Schreiber $519,495.78, which included the entire accelerated amount due on the notes plus 18% interest and attorneys' fees. Rec. Doc. 179. RedHawk appealed the judgment and the Fifth Circuit vacated and remanded to allow RedHawk to file a sur-reply and thereafter reconsider the instant motion to enforce settlement. *RedHawk Holdings Corp. v. Schreiber*, 836 F. App'x 232, 233, 237 (5th Cir. 2020) (per curiam).

While the appeal was pending, RedHawk paid all principal amounts due to Schreiber under the settlement agreement and notes ($400,000 for the remaining notes plus the $250,000 RedHawk paid at the time of settlement). Rec. Doc. 208 at 3. RedHawk subsequently filed its sur-reply to the motion, Rec. Doc. 208, and Schreiber responded. Rec. Doc. 210. The only remaining issue is whether RedHawk breached the acceleration provision of the settlement agreement, thereby entitling Schreiber to interest and attorneys' fees or 10% of the amounts due, whichever is greater.[1]

I.  PARTIES' CONTENTIONS

---

[1] While opposing entitlement issues, RedHawk did not appear to question Schreiber's statement that his current attorney fees in seeking enforcement are greater than 10% of the amount allegedly due.

Schreiber argued that RedHawk's sale of convertible notes and stock warrants for $500,000 constitutes an issuance of "any shares of any series or class for cash." Rec. Docs. 151-1 at 6, 210 at 2-3. RedHawk argued, and this Court generally agreed in its now-vacated order, that convertible notes and stock warrants are not shares, but instead, they make up a debt of the company. Rec. Docs. 157 at 6-7, 162 at 8. However, Schreiber showed without an objection that RedHawk's history demonstrates that even though convertible notes and stock warrants are not shares, RedHawk consistently converts notes and warrants into shares of its common stock. Rec. Docs. 161 at 1, 210 at 5-6. Schreiber also posits that RedHawk's transaction was not purely a debt offering, but a hybrid offering, citing *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 70 (S.D.N.Y. 2015) ("A convertible note is a hybrid security with characteristics of both stocks and bonds."). In support, Schreiber points to RedHawk's 10-k and 10-Q SEC filings that include transactions of convertible notes and other cash advances that Schreiber argues will not be repaid because the company issued shares of its common stock to its creditors. Rec. Doc. 210 at 3-6. The following examples of that history are taken from RedHawk's public filings with the SEC:

> During the fiscal year ended June 20, 2019 . . . We issued 568,529,275 shares of common stock upon the conversion of approximately $929,844 of convertible notes that were previously sold to accredited investors.

> Concurrent with the execution of the Exchange Agreement, holders of $574,250 aggregate principal amount of the Company's 5% convertible promissory notes ("Notes"), including accrued interest, have converted their Notes into 114,849,929 shares of Common Stock. The extinguishment of the notes and related accrued interest for the shares of common stock resulted in a gain on extinguishment of $375,000 based on the closing price of the common stock as of the exchange date.

Rec. Doc. 151-6 at 20, 43. Schreiber contends that the equity component of the transactions—consistently issuing shares of its common stock in exchange for cash—that renders the sale of convertible notes and warrants for $500,000 not a "pure debt transaction," but rather the issuance of "any shares of any series or class for cash" triggering the acceleration clause in the parties' settlement agreement. Rec. Doc. 161 at 3.

Additionally, both parties correctly ask the Court to again consider the parties' intent in light of the attendant events and circumstances when interpreting the language of the settlement agreement. Schreiber asserts that the acceleration clause used expansive language to encompass "*any* shares of *any* series for cash" to protect Schreiber's interest against RedHawk continually diluting the value of its stock. Rec. Docs. 161 at 5, 210 at 5. Schreiber shows that by continuing in this practice, RedHawk has received at least $1 million in proceeds from the issuance of securities covered under the acceleration clause and failed to reduce its debt to Schreiber. RedHawk's SEC filings provide several transactions in which notes were converted into equity and RedHawk

6

issued stocks during pertinent periods. Rec. Doc. 161 at 8. In its sur-reply, RedHawk reaffirms that the underlying facts are not in dispute, but the issue is how to interpret the parties' agreement and apply the rules of the acceleration agreement to the undisputed facts. Rec. Doc. 208 at 4. RedHawk asserts that the outstanding convertible notes that were eventually converted into shares of RedHawk stock were issued and outstanding before the Settlement Agreement, and the debt owed was converted into shares later during the term of the Settlement Agreement. *Id.* at 5.  It concludes receipt of the funds for the convertible notes occurred before the settlement agreement and before any amounts were due to Schreiber.

**II. LAW AND ANALYSIS**

Federal courts have the power to enforce agreements that settle litigation pending before them. *Eastern Energy, Inc. v. Unico Oil & Gas, Inc.*, 861 F.2d 1379, 1380 (5th Cir. 1988). "Although federal courts possess the inherent power to enforce agreements entered into in settlement of litigation, the construction and enforcement of settlement agreements is governed by the principles of state law applicable to contracts generally." *Id.* (citing *Lockette v. Greyhound Lines, Inc.*, 817 F.2d 1182, 1185 (5th Cir. 1987)). Schreiber and RedHawk's agreement specify application of Louisiana law in the resolution of this dispute.

Under Louisiana law, any settlement agreement must be made in writing or recited in open court, in which the recitation shall be

transcribed on the record of the proceedings. LA. CIV. CODE ANN. art. 3071. The Court's role in interpreting the settlement agreement is to determine the common intent of the parties. LA. CIV. CODE ANN. art. 2045. Words and phrases used in settlement agreements are to be construed using their plain, ordinary, and generally prevailing meaning, unless the words have acquired a technical meaning. *See Henry v. S. La. Sugars Co-op., Inc*., 957 So.2d 1275, 1277 (La. 2007) (citing C*adwallader v. Allstate Ins. Co*., 848 So.2d 577, 580 (La. 2003)). "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent" and the agreement must be enforced as written. *Hebert v. Webre*, 982 So.2d 770, 773-74 (La. 2008) (citing LA. CIV. CODE ANN. art. 2046).

This court retained jurisdiction for all purposes including the enforcement of the settlement agreement. Rec. Doc. 150. The parties do not dispute the existence of a written settlement agreement or the acceleration provision therein. The underlying issue before this court is whether the transactions cited in RedHawk's SEC filings trigger the acceleration provision and thus entitle Schreiber to the 18% interest and attorneys' fees and costs or 10% of the amounts due, whichever is greater.

### A. The Acceleration Clause

The acceleration clause at paragraph 6(c) provides:

8

> While any amounts are due to Schreiber, the company agrees that if it issues any shares of any series or class for cash, it shall use 50% of all monetary proceeds received from the issuance to reduce the debts owed to Schreiber.

Rec. Doc. 151-2 at 4.

The undisputed record shows that RedHawk issued shares of its stock while outstanding settlement amounts were owed to Schreiber. RedHawk's exhibit to its sur-reply states the conversions were made from June 26, 2019 through December 9, 2019. Rec. Doc. 208-1, p. 8; see also Rec. Doc. 151-6, pp. 37, 41, 43; Rec. Doc. 161-1, p. 13. As stated earlier, the parties agreed to an amicable resolution on February 6, 2019, and the written settlement agreement was executed on March 22, 2019. Rec. Doc. 151-2. On September 16, 2019 RedHawk issued a Securities and Exchange Commission ("SEC") Form 8-K and contemporaneous press release announcing that RedHawk "completed the sale of $500,000 in aggregate principal amount of new convertible notes". Rec. Doc 151-3 at 4. The convertible notes mature five years from the date of issuance and are convertible into shares of the RedHawk's common stock. *Id.* The contemporaneous press release also announced that RedHawk issued a number of warrants to the purchasers of the convertible notes exercisable ten years from the date of issuance for the purchase of an aggregate of $12,500,000 shares of RedHawk's common stock. *Id.*[2]

---

[2] If a noteholder prefers not to continue to collect interest or not to have its loan repaid at the note's maturity date, then, at its option, the noteholder

9

RedHawk contends that all cash for the issuance of convertible notes were received before the parties confected their settlement agreement. Rec. Doc. 208 at 8. It further contends most cash payments were received before the commencement of the underlying litigation. It admits that notes were later converted into stocks while amounts were due to Schreiber but denies receiving additional cash after execution of the settlement agreement. *Id.*

RedHawk's seeks to limit application of the acceleration terms primarily because the issuance of shares occurred in connection with cash payments it received before the settlement agreement for previously issued convertible notes. However, the aforementioned transactions considered in its totality triggered the acceleration clause because once RedHawk's notes are converted or warrants are exercised, a confirmed sale of shares has occurred and, rather than paying the amount due on the note, RedHawk must use 50% of monetary proceeds received from the issuance to reduce debts owed to Schreiber. Using convertible notes

---

may "convert" its debt "into shares of the Company's common stock . . . at a price of $0.015 per share." Rec. Doc. 151-5 at 4.  When a noteholder exercises that option, RedHawk must issue enough shares of RedHawk stock to satisfy RedHawk's remaining obligation under the note. The press release accompanying the Form 8-K filing defines those unissued shares, to be issued if and when a noteholder exercises its conversion right, as "Note Shares". The noteholders also were issued "a number of warrants exercisable ten years from the date of issuance for the purchase of . . . shares of the Company's common stock" (defining those unissued shares of RedHawk as "Warrant Shares"). *Id.* A stock warrant is a security that grants the holder an option to purchase shares of stock at a fixed price. The warrants granted the noteholders an option to purchase 12.5 million shares of RedHawk ten years from now for "an exercise price of $0.01 per Warrant Share." Rec. Doc. 151-5 at 4.

10

or warrants to blatantly evade the acceleration clause cannot be condoned when RedHawk's SEC filings identify multiple instances where it converted notes into shares without making any payments to reduce its debt to Schreiber.[3] These shares were issued while the settlement amounts were due to Schreiber. Rec. Doc. 208-1 at 8; Rec. Docs. 151-2 and 151-6 at 37, 41, 43; Rec. Doc. 161-1 at 13.

RedHawk's denial of receiving "no payment whatsoever for the issuance of shares" is unconvincing. Again, its own public filings document that shares were issued upon the conversion of notes that represented hundreds of thousands of cash dollars received by RedHawk. Its position in the latter regards is further complexing and refuted by its Chief Financial Officer's affirmation that cash was received on March 15, 2019—less than 30 days after parties agreed to an amicable resolution on February 6, 2019 and a few days before execution of the settlement agreement on March 22, 2019. Rec. Doc. 208-1 at 8. Interestingly, RedHawk appears to also ignore transactions where holders of $142,000 of advances sought to convert their advances into 55,916,667 shares, which were to be

---

[3] Further examples of RedHawk's practices follow: $41,250 of convertible notes, outstanding as of June 30, 2019, were converted into 41,250,000 shares of common stock. Rec. Doc. 151-6 at 37. $76,068 of convertibles notes were converted into 15,213,646 shares of common stock subsequent to June 30, 2019. Rec. Doc. 151-6 at 41. $574,250 aggregate principal amount of RedHawk's convertible promissory notes were converted into 114,849,929 shares of common stock. Rec. Doc. 151-6 at 43. $17,480 of convertible notes were converted into shares of common stock subsequent to September 30, 2019. Rec. Doc. 161-1 at 13.

11

completed during the quarter ending December 31, 2019. Rec. Doc. 161 at 8.

RedHawk's interpretations of the acceleration clause would undermine the language and intent of the parties' agreement. All parties are experienced businessmen and represented by learned counsel. Given RedHawk's history of raising capital by issuance and conversion of convertible notes and warrants, Schreiber agreed to return 52 million shares to RedHawk in exchange for the promise of an immediate partial cash payment and two future payments secured by notes. The parties' agreement required RedHawk to reduce that debt when it issued any series or class of shares, thereby ensuring that Schreiber was protected from RedHawk being completely diluted and its shares devalued in the event RedHawk failed to pay the entirety of the promised future amounts. The shares issued while amounts were due to Schreiber had cash value to RedHawk based on pertinent notes or warrants and constituted, using RedHawks' characterization of the shares issuance, as being done "in connection with cash advances" previously received by RedHawk. Rec. Doc. 208 at 8. It is undisputed that RedHawk received cash in contemplation of issuing shares upon conversion of notes and warrants. The plain and expansive language of the agreement's acceleration clause did not condition when cash would be received for the converted equity (shares of stock) so long as the issuance of that equity occurred "while any amounts are due to Schreiber."

Rec. Doc. 151-2 at 4. Relatedly, the broad language of the acceleration clause placed no restrictions on the type, series or class of shares issued. Clearly, shares issued because of later conversions of notes/warrants into shares were not exempted from coverage. RedHawk correctly states, and we reiterate our finding, that convertible notes and warrants are not shares under Louisiana law. Rec. Doc. 157 at 6-9; Rec. Doc. 162 at 6-9. However, cash received upon issuance of those notes or warrants is conditioned upon and forms an advancement of cash to RedHawk for the later issuance of shares of stock when requested by holders of those instruments. RedHawk cannot fault Schreiber for its agreement to what arguably was a bad or questionable business deal for RedHawk relative to the broad language and scope of the acceleration clause.

Under the foregoing circumstances and because RedHawk has issued shares for cash, by converting notes into equity while amounts are due to Schreiber, RedHawk owes 50% of all monetary proceeds received from the sales to reduce the debts owed to Schreiber. RedHawk is in default of the settlement agreement.

**B. Attorneys' Fees and Costs**

Paragraph 23 of the Settlement Agreement entitles the prevailing party in a dispute in connection with the agreement to an award of reasonable attorneys' fees and costs. It provides in pertinent part that:

> in the event of litigation . . . concerning the interpretation or enforcement of this Agreement, or because of an alleged dispute, default . . . or breach in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees, expenses and costs actually incurred in connection therewith, in addition to any other relief to which it may be entitled.

Rec. Doc. 151-2 at 7.

Paragraph 6(d) of the Settlement Agreement specifies relief available to Schreiber for untimely payment or default by RedHawk. It states, in pertinent part, he is entitled "to actual reasonable attorneys' fees or 10% of the amounts due, whichever is greater, for any sums expended after expiration of the 30-day grace period in pursuing any payment not made timely." Rec. Doc. 151-2 at 4.

Had Schreiber's motion for enforcement of settlement been denied, RedHawk would have basis to seek payment of its attorneys' fees under the aforementioned paragraph 23 of the agreement. Alternatively, it argues that Schreiber's fees should be limited to an award of the sums expended in preparing his reply to RedHawk's opposition to the motion to enforce settlement, and no more. In support, it points to this Court's rejection of the latter motion's reliance on the issuance of convertible notes as a per se issuance of "shares" triggering the acceleration provision. It contends the remaining "claim for payment at issue here did not arise until it was raised, for the first time, in Schreiber's

14

[r]eply to [RedHawk's] opposition." See Rec. Docs. 157, 161. RedHawk declined to make payment to Schreiber under this theory after the filing of Schreiber's reply. RedHawk states the declination was done in the course of lodging its appeal—before any substantial sums were paid by it. That new "theory" is presumably based on Schreiber's reply argument that (a) "RedHawk issued shares in four other transactions since signing the Settlement Agreement, and one which Schreiber alleges is currently, "in process." Rec. Doc. 159 at 4; (b) Schreiber's reply advanced a contradictory anti-dilution purpose; and (c) Schreiber's reliance upon a post-settlement form 10-Q filing by RedHawk on November 19, 2019. Rec. Doc. 159 at 4-8.

Schreiber disputes the limitation that RedHawk places upon his recovery of attorneys' fees and costs. In addition to restating the basis for entitlement to same, he contends that RedHawk improperly prolonged their dispute when it could have limited the amount of fees owed to him by timely paying the amounts awarded in this Court's July 2020 judgment.

Under the settlement agreement's attorney fee clauses and for reasons cited above in successful pursuit of enforcement, Schreiber is entitled to interest and reasonable attorneys' fees and costs or 10% of the amounts due, whichever is greater. The latter topic will be subject to quantifying fees and costs, including limitations, if any, for that award in later proceedings.

**III. CONCLUSION**

The motion to enforce settlement (Rec. Doc. 151) is **GRANTED** and Schreiber is awarded $101,490.27, representing contractual interest in the amount of 18% on the outstanding principal debts until they were paid, plus reasonable attorneys' fees and costs incurred with its successful efforts to enforce the settlement agreement or 10% of the amounts due, whichever is greater.

New Orleans, Louisiana this 23rd day of September 2021

_____
SENIOR UNITED STATES DISTRICT JUDGE